Mark L. Eisenhut, State Bar No. 185039
  Meisenhut@calljensen.com
Samuel G. Brooks, State Bar No. 272107
  Sbrooks@calljensen.com
CALL & JENSEN
A Professional Corporation
610 Newport Center Drive, Suite 700
Newport Beach, CA  92660
Tel:   (949) 717-3000
Fax:   (949) 717-3100

Attorneys for Defendant Kohl's Department Stores, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHROME HEARTS, LLC, a Delaware Limited Liability Company, | Case No.  CV13-02544 BRO(JCGx) |
| Plaintiff, | **DEFENDANT KOHL'S DEPARTMENT STORES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| KOHL'S DEPARTMENT STORES, INC., a Wisconsin Corporation, and DOES 1-10, inclusive, | Date:        February 24, 2014 |
| Defendants. | Time:        1:30 p.m. Courtroom:  14 |

Complaint Filed:   April 10, 2013
Trial Date:          April 29, 2014

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................................................1

II.    FACTS ................................................................................................................1

       A.     Procedural History................................................................................1

       B.     History of the Greek Floriated Cross ...................................................2

III.   LEGAL STANDARD ........................................................................................3

IV.    DISCUSSION ....................................................................................................4

       A.     Chrome Hearts' registrations are not incontestable ............................4

       B.     The CH Plus Mark Is Not Distinctive .................................................7

              1.     The "CH Plus Mark" is not inherently distinctive.................8

              2.     The "CH Plus Mark" lacks secondary meaning ...................9

       C.     Even Assuming the Registrations Are Incontestable, Kohl's
              Can Establish Its Defenses ................................................................10

              1.     The "CH Plus Mark" is Generic ...........................................10

              2.     The "CH Plus Mark" is Functional.......................................11

       D.     Even If the "CH Plus Mark" is Valid, There is No
              Likelihood of Confusion ...................................................................13

              1.     Likelihood of Confusion Cannot Be Presumed ...................13

              2.     The Evidence Confirms that Consumers Are Not
                     Likely to Be Confused by Kohl's Use of a Jeans
                     Button Featuring a Floriated Cross ......................................14

                     a)     Strength of the Mark .................................................15

                     b)     Proximity of the Goods.............................................17

                     c)     Similarity of Marks ...................................................18

                     d)     Evidence of Actual Confusion..................................18

                     e)     Marketing Channels..................................................19

**TABLE OF CONTENTS** *(cont'd)*

Page

f)      Purchaser Care ........................................................................19

g)      Defendant's Intent....................................................................20

h)      Likelihood of Expansion of Product Lines..............................21

i)      Factors Mitigating Potential Confusion...................................21

V.      CONCLUSION...........................................................................22

CALL&
JENSEN

DEFENDANT KOHL'S DEPARTMENT STORES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

1

## TABLE OF AUTHORITIES

2                                                                    Page

3                              Federal Cases

4  *Abercrombie & Fitch Co. v. Hunting World, Inc.*,

5     537 F.2d 4 (2d Cir. 1976) .......................................................................8

6  *Amazing Spaces, Inc. v. Metro Mini Storage*,

7     608 F.3d 225 (5th Cir. 2010) ..................................................................8

8  *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*,

9     457 F.3d 1062, 1068 (9th Cir. 2006) ...............................................11, 15

10 *Butcher Co. v. Bouthot*,

11    124 F. Supp. 2d 750 (D. Me. 2001)........................................................15

12 *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*,

13    94 F.3d 376 (7th Cir. 1996) ...................................................................15

14 *Dymo Industries, Inc. v. Tapeprinter, Inc.*,

15    326 F.2d 141 (9th Cir. 1964) ...............................................................6, 7

16 *E.&J. Gallo Winery v. Cantine Rallo, S.p.A.*,

17    430 F. Supp.2d 1064 (E.D. Cal. 2005) ...................................................6

18 *Entrepeneur Media, Inc. v. Smith*,

19    279 F.3d 1135, 1141-44 (9th Cir. 2002)......................................16, 18, 19

20 *In re Chippendales USA, Inc.*,

21    622 F.3d 1346 (Fed. Cir. 2010) .............................................................8

22 *Pagliero v. Wallace China Co.*,

23    198 F.2d 339 (9th Cir. 1952) ...........................................................11, 12

24 *Payless Shoesource, Inc. v. Reebok Intern. Ltd.*,

25    998 F.2d 985 (Fed. Cir. 1993) .........................................................15, 19

26 *Qualitex Co. v. Jacobson Products Co., Inc.*,

27    514 U.S. 159 (1995) ..............................................................................12

28

DEFENDANT KOHL'S DEPARTMENT STORES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

TABLE OF AUTHORITIES *(cont'd)*

Page

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*,

   532 U.S. 23 (2001) ...................................................................................12

*Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*,

   568 F.2d 1342 (C.C.P.A. 1978)...............................................................8, 9

*Sportvision, Inc. v. Sportsmedia Technology Corp., No. C*,

   04-03115 JW, 2005 WL 1869350 (N.D. Cal. 2005) ................................15

*Sunrise Jewelry Mfg. Corp. v. Fred S.A.*,

   175 F.3d 1322 (Fed. Cir. 1999) ...............................................................10

*Sykes Lab., Inc. v. Kalvin*,

   610 F. Supp. 849 (C.D. Cal. 1985)............................................................6

*Tone Brothers, Inc. v. Sysco Corp.*,

   28 F.3d 1192 (Fed. Cir. 1994) ...................................................................8

*Vision Sports, Inc. v. Melville Corp.*,

   888 F.2d 609 (9th Cir. 1989) ....................................................................9

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,

   529 U.S. 205, 210-11 (2000) ....................................................................8

Federal Statutes

15 U.S.C. § 1065 ...........................................................................................4

15 U.S.C. § 1115 ...........................................................................................7

15 U.S.C. § 1115(b) ......................................................................................5

15 U.S.C. § 1115(b)(8)................................................................................11

15 U.S.C. § 1119 ...........................................................................................7

15 U.S.C. § 1127 ...........................................................................................7

15 U.S.C.A. § 1115(a)...................................................................................4

DEFENDANT KOHL'S DEPARTMENT STORES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

TABLE OF AUTHORITIES *(cont'd)*

Federal Rules

Fed. R. Civ. P. 56(a)................................................................................................3

Other Authorities

1 McCarthy on Trademarks and Unfair Competition § 3:1 (4th ed.) ..............................7

1 McCarthy on Trademarks and Unfair Competition § 7:29 (4th ed.) ...........................8

Page

1 McCarthy on Trademarks and Unfair Competition § 8:13 (4th ed.) ...........................8

2 McCarthy on Trademarks and Unfair Competition § 12:60 (4th ed.) ........................10

4 McCarthy on Trademarks and Unfair Competition § 25:10 (4th ed.) ........................13

6 McCarthy on Trademarks and Unfair Competition § 32:139 (4th ed.) ........................6

Restatement of Torts § 742 ...........................................................................................11

DEFENDANT KOHL'S DEPARTMENT STORES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I.   INTRODUCTION

Plaintiff's motion for partial summary judgment must be denied. It is not supported by any admissible evidence, and in fact the evidence in the record conclusively establishes that Plaintiff's claims are without merit. As explained further below, Plaintiff's asserted trademark is invalid. And even assuming Chrome Hearts can obtain exclusive rights to a common decorative symbol, the evidence establishes that there is zero likelihood that consumers will be confused by Kohl's conduct.

## II.   FACTS

Plaintiff's motion for summary judgment is long on factual assertions, but short on actual evidence. The actual facts, which are supported by the evidence, are as follows.

### A.   Procedural History

Kohl's is a nationwide family-focused, value oriented specialty department store. [Declaration of Shelli Krings ("Krings Dec.") ¶ 1]. In addition to other products, Kohl's sells women's apparel. [Id. ¶ 3]. Within its women's apparel section, Kohl's sells national brands, private brands, and exclusive brands. [Id.]. "Apt. 9" is a private brand owned by Kohl's and sold at Kohl's. [Id.].

In 2012, one of the Apt. 9 designers at Kohl's, Grace Koh, developed a variety of jeans for the "Apt. 9" brand. [Declaration of Samuel G. Brooks ("Brooks Dec.") ¶ 2(a)-(c)]. The design for these jeans included embellishments on the pockets and buttons. [Brooks Dec. ¶ 2(c)].The designer selected a button from a number of options offered by a button supplier. [Brooks Dec. ¶ 2(e)]. The button she selected was embossed with a floral cross design which she found attractive. [Brooks Dec. ¶ 2(e)]. Similar to the majority of Americans, this designer had never heard of Chrome Hearts, and therefore had no idea that Chrome Hearts used a similar design as an embellishment on its own products. [Brooks Dec. ¶ 2(e)]. These products were offered in Kohl's retail stores and

DEFENDANT KOHL'S DEPARTMENT STORES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

CALL&
JENSEN

online. [Krings Dec. ¶¶ 4-5]. Each product was clearly labeled with the "Apt. 9" label printed on the product itself, and sold with "Apt. 9" brand hangtags. [Id. ¶ 6].

To Kohl's surprise, and without any pre-litigation notice, in April 2013 it received a summons and complaint alleging trademark and copyright infringement, as well as a claim for trademark dilution. Kohl's engaged its litigation attorneys to defend the case and began investigating the claims. [Brooks Dec. ¶ 3]. Kohl's initial investigation revealed that the floral cross design was common in the marketplace, and that it appeared to be of ancient origin. [Brooks Dec. ¶ 3]. At this point in time, Kohl's had a significant amount of inventory either in its possession or shipped from the factory. [Id. ¶ 8]. Reasonably and in good faith believing that Chrome Hearts' claims were meritless, Kohl's chose to continue selling the products that it already had. [Id.]. However, Kohl's did select a different embellished button for any jeans styles that had not yet shipped. [Id.].

### B.     History of the Greek Floriated Cross

Chrome Hearts claims to have created the "CH Plus Mark" in 1988. However, the truth is that this symbol is of ancient origin. [Brooks Dec. ¶¶ 4-5, Exhs. 1-2]. Several variations of the floriated cross have been used for a variety of purposes since medieval times. [Id.]. For example, this cross was used in jewelry, architecture, heraldry, religious ceremony, and coinage, just to name a few. [Id. ¶¶ 4-5, 7; Exhs. 1-2, 5]. The "CH Plus Mark" is not appreciably different from these ancient versions. [Brooks Dec. ¶ 5, Exh. 2 (Gerstel Report)].

In 1988, Richard Stark began using a number of variations of the cross to ornament leather goods he designed and sold under the name of Chrome Hearts. In 2006—nearly twenty years later, Chrome Hearts decided to seek trademark registration. The U.S. Patent & Trademark Office granted registrations (No. 3,385,449 for jewelry, and No. 3,388,911 for clothing) in 2008 without requiring Chrome Hearts to prove that the cross symbol had acquired secondary meaning.

DEFENDANT KOHL'S DEPARTMENT STORES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Chrome Hearts alleged in its Complaint that its mark was "incontestable." [Complaint ¶ 18]. That was clearly untrue at the time, as no declaration seeking to have the mark deemed uncontestable had ever been submitted. Later, while this case was pending, and after Kohl's had answered the Complaint, Chrome Hearts filed declarations to request that the mark be deemed incontestable. [Declaration of M. Lejtman in support of Plaintiff's Motion for Summary Judgment ("Decl. of M. Lejtman") Dec. Exh. 2]. Chrome Hearts' declarations were not true. Despite Kohl's answer clearly challenging Chrome Hearts' purported rights to its mark, Chrome Hearts falsely informed the Patent and Trademark Office that no such case was pending.

While Chrome Hearts has sought and obtained trademark registration, it is not the only company that uses this symbol. Jewelry featuring the floriated cross is abundant, and it is sold by a wide variety of sellers—from small sellers on Etsy, to high end jewelry designers such as Hellmuth. [Brooks Dec. Exhs. 2, 4]. A Google search for "fleur cross jewelry" yields pages upon pages of options featuring jewelry in the form of a floriated cross—both in the Latin (long upright and shorter cross bars) and Greek (cross arms equal in length) variations. [Brooks Dec. ¶ 6, Exh. 3].

Given the common use of this symbol as ornamentation from medieval to modern times, Chrome Hearts cannot monopolize its use simply by filing an application for trademark registration unless the symbol has acquired secondary meaning for Chrome Hearts products. Nor can Chrome Hearts obtain incontestable status while its rights are still at issue in litigation.

## III.   LEGAL STANDARD

The standard for granting summary judgment is well established. Summary judgment is proper if there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Here, to the extent the facts are not disputed, they require judgment in favor of Defendant—not Plaintiff.

1  **IV.    DISCUSSION**

2       **A.    Chrome Hearts' registrations are not incontestable**

3       In order to prevail on its cause of action for infringement of a registered

4  trademark, Plaintiff must establish that it owns a valid, protectable mark, and that

5  Defendant used the mark in a way that is likely to cause confusion among ordinary

6  consumers as to the source, sponsorship, affiliation, or approval of the goods. Ninth

7  Circuit Manual of Model Jury Instructions: Civil 15.5. Registration is prima facie

8  evidence that the Plaintiff owns a valid, protectable mark, but the presumption is

9  rebuttable. 15 U.S.C.A. § 1115(a) (registration "shall not preclude another person from

10 proving any legal or equitable defense or defect, including those set forth in subsection

11 (b) of this section, which might have been asserted if such mark had not been

12 registered").

13      A registration may become incontestable under certain circumstances. *See* 15

14 U.S.C. § 1065. Incontestable status may only be conferred if:

15      (1) there has been no final decision adverse to the owner's claim of

16      ownership of such mark for such goods or services, or to the owner's right

17      to register the same or to keep the same on the register; and

18      (2) there is no proceeding involving said rights pending in the United

19      States Patent and Trademark Office or in a court and not finally disposed

20      of; and

21      (3) an affidavit is filed with the Director within one year after the

22      expiration of any such five-year period setting forth those goods or

23      services stated in the registration on or in connection with which such

24      mark has been in continuous use for such five consecutive years and is still

25      in use in commerce, and other matters specified in paragraphs (1) and (2)

26      of this subsection; and

27

28

1    (4) no incontestable right shall be acquired in a mark which is the generic

2    name for the goods or services or a portion thereof, for which it is

3    registered.

4   *Id.* Even if a registered mark becomes incontestable, a party charged with infringement

5   may still avoid liability by proving that the registration or incontestable status was

6   obtained fraudulently, or that the mark is generic, that the defendant's use is a fair use,

7   or that the mark is functional. *See* 15 U.S.C. § 1115(b).

8        Plaintiff cannot obtain incontestable status while this case is pending because this

9   is a proceeding involving Plaintiff's rights. In filing its affidavit for incontestable status,

10  Chrome Hearts' attorney purported to "verify" on October 22, 2013 that there was no

11  case pending and not finally disposed of in any court involving Chrome Hearts' rights

12  to the "CH Plus Mark." [Lejtman Dec. Exh. 2]. But that verification was demonstrably

13  false—this case was pending on that date, it has not been finally disposed of, and it

14  involves Chrome Hearts' rights to the "CH Plus Mark."

15       In particular, Kohl's has alleged in its pleading that Chrome Hearts' registration

16  is invalid. In paragraph 18 of its Complaint, Chrome Hearts alleges that its registrations

17  are "valid, subsisting, and incontestable." [Complaint ¶ 18]. Kohl's denied these

18  allegations. [Answer ¶ 18]. Moreover, Kohl's alleged affirmative defenses challenging

19  Chrome Hearts' rights, including the Fifth Defense ("Plaintiff has supplied false

20  information to the United States Patent & Trademark Office and/or has sought to

21  deceive consumers, or has acted inequitably in some other manner that is related to the

22  subject matter of Plaintiff's claims"), the Eighth Defense ("Plaintiff's claims for

23  infringement of trademark, dilution of trademark, and unfair competition are barred on

24  the grounds that Plaintiff's alleged mark is not inherently distinctive, and has not

25  acquired distinctiveness"), the Twelfth Defense ("Plaintiff's claims are barred because

26  of its anti-competitive intent and conduct, its misuse of its purported copyrights and

27  trademarks, and its abuse of the judicial process"), the Sixteenth Defense

28  (Abandonment); the Eighteenth Defense (Fraud in Obtaining Trademark Registration),

CALL&
JENSEN

and the Twenty-Second Defense ("The CH Plus Mark is invalid because it is a common and generic symbol and is not entitled to protection, or it has become generic due to extensive third party use"). Given the claims and defenses at issue in this case, this case does involve Plaintiff's right to register the "CH Plus Mark." Therefore, Chrome Hearts is not entitled to obtain incontestable status.

Plaintiff may argue that this case does not "involve" its rights to the registered trademarks because Kohl's has not filed a counterclaim for cancellation of the registrations. However, a collateral attack on a registration "can take the form of both (1) an affirmative defense to infringement; and (2) a counterclaim for cancellation of the registration." 6 McCarthy on Trademarks and Unfair Competition § 32:139 (4th ed.). Indeed, a counterclaim is not a prerequisite to an order cancelling a registration. "The court's powers under [section 1119] to 'rectify the register' may be invoked whenever the validity of a registered mark is properly put in issue, as was the case here through defendants' affirmative defenses." *Sykes Lab., Inc. v. Kalvin*, 610 F. Supp. 849, 863 n. 10 (C.D. Cal. 1985); *see also Dymo Industries, Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964). The plain meaning of the word "involve" is broad, and if an affirmative defense is sufficient to result in cancellation of registration, then it is sufficient to result in a finding that the case "involves" Plaintiff's rights. In short, the statute[1] does not require a defendant to file a counterclaim in order to put the validity of

---

[1] Plaintiff may also argue in reply that under the USPTO's Trademark Manual of Examining Procedure ("TMEP"), "the USPTO does not consider a proceeding involving the mark in which the owner is the plaintiff, where there is no counterclaim involving the owner's rights in the mark, to be a 'proceeding involving these rights' that would preclude the filing or acknowledgment of a § 15 affidavit or declaration." TMEP § 1605.04. However, as set forth above, Kohl's answer and affirmative defenses are equivalent to a counterclaim in this context.  Further, the USPTO's interpretation of the term "proceeding involving these rights" is neither binding nor persuasive. The TMEP is not law, and its interpretations of statutory language are entitled to little if any deference. *See, E.&J. Gallo Winery v. Cantine Rallo, S.p.A.*, 430 F. Supp.2d 1064, 1081-82 (E.D. Cal. 2005) (recognizing that TMEP is not a published rule subject to notice and comment, and is therefore entitled to little deference). Indeed, the USPTO does not make determinations as to whether a mark actually is incontestable. *See* TMEP § 1605 ("Acknowledging receipt of the affidavit or declaration . . . is not a determination by the USPTO that the registration is in fact incontestable. The question of whether the registration is incontestable arises and is determined by a court if there is a proceeding involving the mark.").



DEFENDANT KOHL'S DEPARTMENT STORES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1  the registration at issue in an infringement action. Plaintiff's registrations have not

2  become, and cannot become incontestable while this action is pending.

3       **B.      The CH Plus Mark Is Not Distinctive**

4       Because Chrome Hearts' registrations remain contestable, Kohl's may rebut the

5  presumption of validity. *See, e.g.*, *Dymo Industries, Inc. v. Tapeprinter, Inc.*, 326 F.2d

6  141, 143 (9th Cir. 1964) ("A registered trademark may be cancelled by direct attack as

7  prescribed by the statute, and it may also be collaterally attacked in any action where

8  the validity of the mark is properly in issue."). The Lanham Act provides that a

9  defendant may assert "any legal or equitable defense or defect . . . which might have

10 been asserted if such mark had not been registered." 15 U.S.C. § 1115. It also vests in

11 the district court the power to "determine the right to registration, order the cancelation

12 of registrations, in whole or in part, restore canceled registrations, and otherwise rectify

13 the register with respect to the registrations of any party to the action." *Id.* § 1119.

14      The key requirement for registration is that the asserted trademark be

15 distinctive—that is, that it "identify and distinguish [a person's] goods, including a

16 unique product, from those manufactured or sold by others," and that it "indicate the

17 source of the goods." 15 U.S.C. § 1127 (definition of "trademark"); *see also* 1

18 McCarthy on Trademarks and Unfair Competition § 3:1 (4th ed.) ("In determining what

19 can qualify as a trademark, it is crucial that the symbol in question be so distinctive that

20 it is capable of performing the function of identifying and distinguishing the goods that

21 bear the symbol.").

22      In testing for distinctiveness, courts generally first inquire whether the asserted

23 mark is inherently distinctive, or whether it requires proof of secondary meaning.

24      [U]ltimately "the focus of the [inherent distinctiveness] inquiry is whether

25      or not the trade dress is of such a design that a buyer will immediately rely

26      on it to differentiate the product from those of competing manufacturers; if

27      so, it is inherently distinctive." . . . If the mark is not inherently distinctive,

28      it is unfair to others in the industry to allow what is in essence in the public

CALL &
JENSEN

1   domain to be registered and appropriated, absent a showing of secondary

2   meaning.

3   *In re Chippendales USA, Inc.*, 622 F.3d 1346, 1352 (Fed. Cir. 2010) (*quoting Tone*

4   *Brothers, Inc. v. Sysco Corp.*, 28 F.3d 1192, 1206 (Fed. Cir. 1994)). The presumption of

5   validity afforded by registration is rebutted "by establishing that the mark is not

6   inherently distinctive." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 237

7   (5th Cir. 2010).

8   **1.   The "CH Plus Mark" is not inherently distinctive**

9   Many courts use the *Abercrombie* test to determine whether a word mark is

10  inherently distinctive: *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205,

11  210-11 (2000) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10-

12  11 (2d Cir. 1976)). However, this test does not work well for non-word marks. *See* 1

13  McCarthy on Trademarks and Unfair Competition § 8:13 (4th ed.) ("The word spectrum

14  of marks simply does not translate into the world of shapes and images."). Instead, most

15  courts use the *Seabrook* test to inquire whether a non-word mark is inherently

16  distinctive. *Id.* Furthermore, it is widely recognized that common geometric shapes are

17  not inherently distinctive. 1 McCarthy on Trademarks and Unfair Competition § 7:29

18  (4th ed.) ("Most common geometric shapes are regarded as not being inherently

19  distinctive.").

20  Under the *Seabrook* test, courts ask whether the symbol (1) is a "common" basic

21  shape or design, (2) whether it is unique or unusual in a particular field, (3) whether it is

22  a mere refinement of a commonly-adopted and well-known form of ornamentation for a

23  particular class of goods viewed by the public as a dress or ornamentation for the goods,

24  or (4) whether it is capable of creating a commercial impression distinct from any

25  accompanying words. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 243

26  (5th Cir. 2010) (citing *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342,

27  1344 (C.C.P.A. 1978)). In *Amazing Spaces*, for example, the court applied the *Seabrook*

28

DEFENDANT KOHL'S DEPARTMENT STORES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

1  test to conclude that a five-pointed star set within a circle was not inherently distinctive

2  as applied to self-storage facilities in Texas. *Id.* at 241-47.

3      Plaintiff's asserted trademark indisputably fails the test for inherent

4  distinctiveness. The evidence establishes that the Greek floriated cross is a common

5  symbol that has been in existence for ages.[2] [Brooks Dec. ¶ 5, Exh. 2 (Gerstel Report)].

6  To the extent the symbol has any inherent distinctiveness, it is to associate the user with

7  Christianity—not with any particular company. [Id.]. Likewise, there is nothing unique

8  or unusual about the symbol's use on clothing or jewelry. This particular variant of the

9  cross is exceedingly common for jewelry and clothing. [Brooks Dec. ¶¶ 4-6, Exhs. 1-4].

10 To the extent the version used by Chrome Hearts is in any way distinguishable from

11 other versions, it is no more than a mere refinement of a well-known and commonly-

12 adopted symbol. Finally, given the ubiquity of the cross, it is incapable of creating a

13 distinct commercial impression apart from accompanying words—indeed, when

14 consumers were shown this symbol as used on a jeans button, they did not associate it

15 with any brand. [Brooks Dec. ¶ 8, Exh. 6 (Hollander Report at 18 ¶ 49, 25 ¶ 72)]

16     In short, the "CH Plus Mark" is not inherently distinctive. Instead, Plaintiff must

17 prove that the "CH Plus Mark" has acquired distinctiveness through secondary meaning.

18 Plaintiff did not prove secondary meaning in obtaining its registration. Therefore, it

19 cannot rely on the registration to prove validity. In fact, Plaintiff's registrations must be

20 cancelled.

21          **2.    The "CH Plus Mark" lacks secondary meaning**

22     Not only is the "CH Plus Mark" not inherently distinctive, it is not distinctive at

23 all. The strongest evidence of whether a mark has achieved secondary meaning is

24 through a consumer survey. *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615

25

26 _____

[2] The saying that a thing has been in existence "for ages" is ordinarily a colloquialism

27 which means the thing has existed for a long time. But to say that Chrome Hearts' cross
design has been in existence "for ages" is literally true. The Greek floriated cross has

28 been used by churches, knights, kings, jewelers, architects, and artists since the Middle
Ages.

DEFENDANT KOHL'S DEPARTMENT STORES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

CALL &
JENSEN

(9th Cir. 1989) ("An expert survey of purchasers can provide the most persuasive evidence of secondary meaning."). In this case, an expert survey revealed that the "CH Plus Mark" does not have secondary meaning. [Brooks Dec. ¶ 8, Exh. 6 (Hollander Report at 18 ¶ 49, 25 ¶ 72)].

Chrome Hearts does not present any admissible evidence of secondary meaning in its motion. However, Defendant expects Chrome Hearts will argue in reply that the mark has obtained secondary meaning through advertisements in—for the most part—obscure fashion magazines, and by exposure Chrome Hearts has received as a result of celebrities who have been seen wearing Chrome Hearts jewelry. This evidence is not admissible for the reasons set forth in Defendant's objections. However, to the extent such circumstantial evidence is admissible, it is extremely weak. In light of the direct survey evidence that consumers *do not* associate the "CH Plus Mark" with any brand, it is clear that the mark has no secondary meaning. Indeed, Kohl's intends to file a motion for summary judgment on this issue.

## C.   Even Assuming the Registrations Are Incontestable, Kohl's Can Establish Its Defenses

As explained above, Chrome Hearts has not obtained incontestable status for its registrations, and cannot do so while this suit remains pending. Nevertheless, even assuming the registrations are incontestable, Kohl's can prove affirmative defenses that rebut the validity of Plaintiff's trademark. In particular, the evidence establishes that the "CH Plus Mark" is generic and aesthetically functional.

### 1.   The "CH Plus Mark" is Generic

While "genericness" is not included in the list of defenses to an incontestable mark, it is beyond dispute that a registration for a mark that has become generic must be cancelled—incontestable or not. 2 McCarthy on Trademarks and Unfair Competition § 12:60 (4th ed.) ("Lanham Act § 15(4) specifically mandates that no incontestable right shall be acquired in a generic name."). The term "generic name" is read expansively "to encompass anything that has the potential but fails to serve as an indicator of source,

DEFENDANT KOHL'S DEPARTMENT STORES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

such as names, words, symbols, devices, or trade dress," including a symbol such as the CH Plus Mark. *Sunrise Jewelry Mfg. Corp. v. Fred S.A.*, 175 F.3d 1322, 1326 (Fed. Cir. 1999) ("Any narrower interpretation of 'generic name' would allow incontestable trademarks other than names that become generic to retain incontestable status despite their inability to serve as source designators.").

As applied to items such as jewelry and apparel, the "CH Plus Mark" is generic. The symbol of the Greek floriated cross is widely used in the industry as ornamentation, [Brooks Dec. ¶¶ 4-6, Exhs. 1-4], and it does not serve as a source indicator. As Kohl's expert survey confirms, there is not even an appreciable portion of consumers who view the "CH Plus Mark" as an indicator of a product's source. [Brooks Dec. ¶ 8, Exh. 6 (Hollander Report 25-26, ¶¶ 71-75)]. As such, Chrome Hearts' registrations must be cancelled.

### 2. The "CH Plus Mark" is Functional

An incontestable mark may also be declared invalid if it is shown to be functional. 15 U.S.C. § 1115(b)(8). The "CH Plus Mark" is functional under the doctrine of aesthetic functionality.

The doctrine of aesthetic functionality traces back to a comment in the 1938 Restatement of Torts: "When goods are bought largely for their aesthetic value, their features may be functional because they definitely contribute to that value and thus aid the performance of an object for which the goods are intended." *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1068 (9th Cir. 2006) (quoting Restatement of Torts § 742, comment a (1938)). The Ninth Circuit officially adopted the doctrine in *Pagliero v. Wallace China Co.*:

'Functional' in this [trademark] sense might be said to connote other than a trade-mark purpose. If the particular feature is an important ingredient in the commercial success of the product, the interest in free competition permits its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary

embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made.

198 F.2d 339, 343 (9th Cir. 1952). In *Pagliero*, the court held that a decorative design on a plate was functional because "the attractiveness and eye-appeal of the design sells the china. Moreover, from the standpoint of the purchaser china satisfies a demand for the aesthetic as well as for the utilitarian, and the design on china is, at least in part, the response to such demand." *Id.* at 343-44.

The Supreme Court further developed the doctrine of aesthetic functionality. In *Qualitex Co. v. Jacobson Products Co., Inc.*, the Court held that a product feature is functional "if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." 514 U.S. 159, 165 (1995). In *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, the Supreme Court further explained that "[i]t is proper to inquire into a 'significant non-reputation-related disadvantage' in cases of esthetic functionality." 532 U.S. 23, 33 (2001).

The aesthetic functionality doctrine applies in this case. In the context of jewelry (an industry whose sole aim is aesthetics), consumers purchase products bearing the "CH Plus Mark" not to insure that the goods come from Chrome Hearts, but because they want attractive jewelry featuring a floral cross design. With respect to apparel, the use of a floriated cross symbol on a button is purely aesthetic. Indeed, the clothing designer who selected the button at issue for Kohl's had never heard of Chrome Hearts, but she chose that button because of its aesthetic value. [Brooks Dec. ¶ 2(d)-(e)]. The market evidence confirms that there is demand for buttons embellished with a floriated cross. [Brooks Dec. ¶¶ 4-6, Exhs. 1-4]. In other words, consumers purchase goods decorated with the floriated cross because they like the design of the floriated cross. To grant Chrome Hearts a monopoly on the ornamental use of such a symbol would put

CALL & JENSEN

competitors at a serious non-reputation related disadvantage because it would entirely remove a highly desirable decorative symbol from the marketplace.

Furthermore, any possibility for confusion as to the source of products decorated with the floriated cross is readily mitigated by the use of traditional trademarks. Indeed, in this case Kohl's marked its products with tags and labels identifying the source as "Apt. 9." [Krings Dec. ¶ 6]. As for Chrome Hearts, all of their jeans have a sewn-in label that says "Chrome Hearts." [Eisenhut Dec. Exh. 1, Lejtman Depo at 37:7-38:15]. Because products decorated with the floriated cross symbol can be sold by multiple competitors without damage to any party's reputation, granting a monopoly to one market participant would put competitors at a significant non-reputation-related disadvantage.

In sum, the evidence establishes that the "CH Plus Mark" is functional. Therefore, Kohl's is entitled to judgment on Plaintiff's claim even if the registration has become incontestable.

### D.   Even If the "CH Plus Mark" is Valid, There is No Likelihood of Confusion

Plaintiff argues that Kohl's use of a button bearing a floriated cross on Apt. 9 brand jeans is likely to cause confusion. However, the evidence is directly contrary. It is Kohl's—not Plaintiff—who is entitled to summary judgment.

#### 1.   Likelihood of Confusion Cannot Be Presumed

Plaintiff's primary argument is that likelihood of confusion should be presumed because Kohl's is guilty of selling counterfeit goods. The argument is laughable. Plaintiff cites a wealth of authority that likelihood of confusion may be presumed in a counterfeiting case. But there is a dearth of evidence that this is a case of counterfeiting.

Plaintiff cites McCarthy in support of its argument that Kohl's used a counterfeit mark. That same section goes on to say, "counterfeiting is 'hard core' or 'first degree' trademark infringement and is the most blatant and egregious form of 'passing off.'" 4 McCarthy on Trademarks and Unfair Competition § 25:10 (4th ed.). Thus, in order to

CALL&
JENSEN

find that Kohl's is guilty of counterfeiting, the court must conclude that Kohl's attempted to "pass off" its products as genuine Chrome Hearts products. Regardless of the similarity between the symbol Kohl's used for some of its jeans buttons and the "CH Plus Mark," Plaintiff cannot seriously contend that Kohl's was attempting to pass off Apt. 9 brand jeans as genuine Chrome Hearts products.

Indeed, the designer who chose the button had never even heard of Chrome Hearts until she learned of this lawsuit. [Brooks Dec. ¶ 2(d)]. The jeans sold at Kohl's were clearly marked with the Apt. 9 label—not with the Chrome Hearts label.[3] [Krings Dec. ¶ 6]. The only challenged mark on the Kohl's products is the cross symbol on the button. None of the Kohl's products in question have any indication that they come from "Chrome Hearts." And when shown photos of the Apt. 9 jeans, survey respondents overwhelming identified Apt. 9 and Kohl's as the source. [Brooks Dec. ¶ 8, Exh. 6 (Hollander Report at 25 ¶ 73)]. Even when the "Apt. 9" name was not visible, not a single respondent thought the jeans were authentic Chrome Hearts products, or affiliated with Chrome Hearts in any way. [Brooks Dec. ¶ 8, Exh. 6 (Hollander Report at 18 ¶¶ 48-50)]. This is simply not a case of counterfeiting.

## 2. The Evidence Confirms that Consumers Are Not Likely to Be Confused by Kohl's Use of a Jeans Button Featuring a Floriated Cross

As a back-up to its frivolous counterfeiting argument, Plaintiff also contends that Kohl's use of the floriated cross-embellished button is likely to cause confusion under the traditional *Sleekcraft* test. Unfortunately for Plaintiff, the evidence establishes that customers are not likely to be confused.

As an initial matter, by arguing only post-sale confusion, Plaintiff tacitly admits that there is no likelihood that consumers will be confused at point-of-sale. This admission is well-taken, since it is uncontroverted that the accused products are well

---

[3] In fact, the very image Plaintiff included in its Complaint clearly shows the "Apt. 9" label. [See Dct 1, Complaint, at 6].

1  marked with the Apt. 9 logo at the point-of-sale, including by labels permanently
2  affixed to the jeans, hangtags, and store signage. [Krings Dec. ¶ 6].

3      Some of the factors that relate to possible point-of-sale confusion do not apply (or
4  are less relevant) in the context of post-sale confusion. *See Payless Shoesource, Inc. v.*
5  *Reebok Intern. Ltd.*, 998 F.2d 985, 989-90 (Fed. Cir. 1993). Thus, factors such as the
6  strength of the mark, proximity of goods, similarity of the marks, actual confusion, and
7  the defendant's intent become more important in the context of post-sale confusion. *Au-*
8  *Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1077-78 (9th Cir.
9  2006).

10      However, because post-sale confusion does not deal with direct consumers, the
11  Plaintiff's burden to prove a likelihood of confusion is heightened. *See, e.g.*, *Dorr-*
12  *Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 382 (7th Cir. 1996) (no likelihood of post-
13  sale confusion where potential post-sale viewers of the product were not potential
14  customers). The Plaintiff has to present evidence the likelihood of confusion among
15  Plaintiff's potential customers is more than speculative. *See, e.g.*, *Sportvision, Inc. v.*
16  *Sportsmedia Technology Corp.*, No. C 04-03115 JW, 2005 WL 1869350, at *10 (N.D.
17  Cal. 2005) ("bare allegation" of what might happen in post-sale context insufficient);
18  *Butcher Co. v. Bouthot*, 124 F. Supp. 2d 750, 757-58 (D. Me. 2001) (rejecting possible
19  scenarios of post-sale confusion as "nothing but speculative").

20      Here, the evidence does not support a finding of either point-of-sale or post-sale
21  confusion. Rather, summary judgment should be entered in favor of Kohl's that there is
22  no likelihood of confusion.

23              **a)**    **Strength of the Mark**
24      One of the factors that is highly relevant in determining likelihood of confusion
25  after the point of sale is whether the mark is strong or weak. As thoroughly discussed
26  above, the "CH Plus Mark" is not distinctive. Indeed, the evidence establishes that this
27  symbol is generic in the jewelry and apparel industries. However, even assuming the
28  mark is valid, it is exceptionally weak.

DEFENDANT KOHL'S DEPARTMENT STORES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

A mark is considered strong if it is inherently distinctive, or if it has acquired a high degree of secondary meaning through advertising, a long period of exclusive use, or significant public recognition. *See Entrepeneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141-44 (9th Cir. 2002). As already discussed, the "CH Plus Mark" is not inherently distinctive because it is a common symbol that does not automatically act as a source indicator. Furthermore, Chrome Hearts has not obtained any degree of secondary meaning, which is confirmed by persuasive expert survey evidence. [Brooks Dec. ¶ 8, Exh. 6 (Hollander Report 25-26 ¶¶ 71-75)].

Chrome Hearts argues that its mark should be presumed strong because it was registered and because it has obtained incontestable status. The case Plaintiff cites does not support this proposition. Neither does logic or the evidence. Kohl's has already shown that the mark is not inherently distinctive and, therefore, should never have been registered. And Plaintiff cannot obtain incontestable status while this case is pending. The fact that Plaintiff filed an affidavit in an improper attempt to obtain incontestable status while this case was pending proves nothing except that five years have passed since the mark was improperly registered. It certainly does not prove that the "CH Plus Mark" is strong.

Perhaps recognizing that registration alone is a thin reed to lean on, Chrome Hearts argues that the "CH Plus Mark" should be deemed strong because of advertising and length of use. However, the "evidence" Chrome Hearts relies on consists mostly of advertising in "high end and artistic" (i.e., obscure) fashion magazines, including advertisements apparently distributed in Japan. [See Lejtman Depo ¶ 12, Exh. 4]. This is hardly likely to create recognition among the general consuming public in the United States. Furthermore, to the extent advertising has created any public recognition, that recognition would apply only to the word mark, "Chrome Hearts"—not the decorative symbols that make up the products themselves. Likewise, any praise Chrome Hearts has received might bolster the strength of the word mark, "Chrome Hearts," but there is no reason to believe it strengthens trademark rights in a common ornamental cross symbol.

Finally, Chrome Hearts boasts that its sales from products bearing the "CH Plus Mark" are REDACTED . This is not accurate. The figures Chrome Hearts disclosed in discovery are significantly lower. [Eisenhut Dec. Exh. 1, Lejtman Depo at 78:12-79:21, 81:3-83:1, Exh. 1]. However, given the ridiculously high prices Chrome Hearts charges for its products (up to REDACTED for a single piece of jewelry), REDAC over a period of twenty-five years does not represent a significant volume of sales in terms of units sold (for example, if Chrome Hearts sold only 100 items for REDAC each, it would have REDACTED in sales). Furthermore, this figure presumably includes foreign sales, which are irrelevant to strength of the mark in the United States.[4] The truth is that Chrome Hearts' presence in the United States is minimal. It sells its high-priced products at a handful of boutiques and luxury stores, consciously excluding all but the "in crowd." [Eisenhut Dec. Exh. 1, Lejtman Depo at 29:11-30:25, 52:10-54:1]. This concerted strategy may help create the luxury image Chrome Hearts strives for, but it does not create widespread, strong recognition of the "CH Plus Mark."

In short, assuming the "CH Plus Mark" is valid to any degree, it is an extremely weak mark. This factor weighs against a finding of likelihood of confusion.

### b)      Proximity of the Goods

Plaintiff argues that this factor weighs in its favor because both parties "have sold denim wear." What Plaintiff fails to disclose is that jeans make up REDAC of its sales. [Eisenhut Dec. Exh. 1, Lejtman Depo at 38:20-23]. Furthermore, the jeans that Plaintiff sells range in price from REDACTED per pair, and are adorned with sterling silver ornamentation. [Eisenhut Dec. Exh. 1, Lejtman Depo at 91:24-92:13]. Kohl's, on the other hand, sold the products at issue at modest prices. For example, Plaintiff disclosed in discovery that it made target purchases of the products at issue in this case for $29.99 (capris) and $12 (shorts), respectively. [Brooks Dec. ¶ 10, Exh. 7.] Chrome Hearts jeans

---

[4] Sales in the United States account for approximately ____ of Chrome Hearts' sales. [Lejtman Depo at 19:24-20:5].

priced at REDA and studded with sterling silver hardware cannot seriously be said to be in competition with Apt. 9 jeans priced at $12 at Kohl's.

In sum, this factor weighs against a likelihood of confusion. Kohl's and Chrome Hearts are not competitors, and it is practically inconceivable that any person familiar with both brands would think Apt. 9 jeans were related in some way or sponsored by Chrome Hearts.

### c)      Similarity of Marks

Kohl's does not deny that the floriated cross symbol on the buttons for its jeans looks similar to the floriated cross symbol that Plaintiff claims as the "CH Plus Mark." However, Plaintiff's assertion that Kohl's "sought to mimic the CH Plus Mark" is without any basis in fact. The clothing designer who selected the button for Kohl's testified that she had never heard of Chrome Hearts, and that she chose the floriated cross button solely for its aesthetic appeal. [Brooks Dec. ¶ 2(d)-(e)]. As for Chrome Hearts' allegation that the Apt. 9 jeans display this button "in the same exact manner as the CH Plus Mark appears on CHROME HEARTS® jeans," Chrome Hearts has not offered any exemplars or other evidence whatsoever of what Chrome Hearts denim jeans actually look like or how they utilize the "CH Plus Mark." Therefore, this unfounded assertion must be rejected.

### d)      Evidence of Actual Confusion

Conceding that it has <u>no</u> such evidence, Plaintiff argues that evidence of actual confusion is not <u>required</u> to prove a likelihood of confusion. However, evidence that customers actually **<u>are not</u>** confused weighs heavily against a finding of likelihood of confusion. Here, a professionally conducted survey resulted in a finding that zero percent of respondents thought the jeans at issue were sponsored by or affiliated with Chrome Hearts. [Brooks Dec. ¶ 8, Exh. 6 (Hollander Report at 18 ¶¶ 48-50)]. This result held true even when respondents did not see the "Apt. 9" brand name. [Id.]. The conclusion is inescapable—ordinary consumers are not likely to be confused as to whether Apt. 9 jeans are in some way connected with Chrome Hearts.

### e)   Marketing Channels

Plaintiff does not seek a finding of point-of-sale confusion, tacitly admitting that Kohl's customers are not likely to believe that Apt. 9 jeans are somehow connected to Chrome Hearts. With respect to post-sale confusion, this factor is largely irrelevant. Nevertheless, to the extent this factor is relevant, it favors Kohl's. In particular, there is no overlap in marketing between Kohl's and Chrome Hearts. With respect to advertising, Chrome Hearts advertises in fashion magazines. [Lejtman Dec. ¶ 12]. Kohl's, on the other hand, advertises by television, radio, internet, and mailers. With respect to sales, Chrome Hearts offers its goods at only twelve locations in the entire United States. [Eisenhut Dec. Exh. 1, Lejtman Depo at 29:11-30:25, 52:10-54:1]. REDACTED of its domestic sales are made in only five boutique stores. [Id., Lejtman Depo at 30:8-14]. And some of those stores are not even signed as Chrome Hearts facilities. [Id., Lejtman Depo at 42:7-44:25]. In other words, Chrome Hearts "retail" stores are highly exclusive. Kohl's, on the other hand, sells its products nationwide in its Kohl's-branded department stores, online at kohls.com, at in-store kiosks, and via tablet and smartphone apps. [Krings Dec. Exh. 1 (Factbook at 10)]. Kohl's has 1158 retail stores in 49 states. [Id. (Factbook at 11)]. The locations of these stores are widely publicized and highly visible to any passerby. Plaintiff's marketing method could not be any more different from Kohl's.

### f)   Purchaser Care

Plaintiff admits that when goods are expensive, it is less likely that a reasonably prudent buyer would be confused as to the source of goods. However, Plaintiff argues that purchaser care is not relevant with respect to post-sale confusion. While one court has stated in dicta that this factor is not relevant to post-sale confusion (*Payless Shoesource, Inc. v. Reebok Intern. Ltd.*, 998 F.2d 985, 988-99 (Fed. Cir. 1993), that is not a binding pronouncement for this circuit.

The degree of consumer care can be highly relevant in the context of post-sale confusion, although the type of care exercised may be somewhat different than at point-

of-sale. The question in this case is whether a potential purchaser of Chrome Hearts products is likely to be confused if she sees the Apt. 9 jeans. As a luxury brand selling jeans for REDACTED per pair, the pool of potential Chrome Hearts customers is limited to individuals of significant means with discriminating taste. Such potential consumers are highly likely to take care before concluding that a pair of Apt. 9 jeans they see on the street, with no similarities to a Chrome Hearts pair of jeans other than a single button, are from Chrome Hearts.

### g)   Defendant's Intent

As already discussed, Kohl's did not select the button at issue in this case with the intent to trade on the good will belonging to Chrome Hearts. The designer who chose that button had never even heard of Chrome Hearts. [Brooks Dec. ¶ 2(d)]. And while Kohl's did continue to sell the jeans at issue after receiving Chrome Hearts' lawsuit, it did so in the reasonable and good faith belief that Plaintiff's claims were without merit, and it only sold the items already in production. [Krings Dec. ¶ 8 (erroneously numbered 7)]. As already discussed, Kohl's has reason to believe that the "CH Plus Mark" is not valid. And even if it is valid, the evidence confirms Kohl's reasonable belief that its sales have not caused and are not likely to cause any confusion among consumers.

Kohl's has not attempted to draw any comparisons between itself and Chrome Hearts. It has not tried to pass off its goods as authentic Chrome Hearts products. It did not place the Chrome Hearts name on any of its items. Rather, it placed the Apt. 9 name on each item. [Krings Dec. ¶ 6]. And it has not received any feedback from consumers indicating that there is any actual confusion. [Id. ¶ 7]. When Kohl's received notice of Plaintiff's claims, it selected a different embellished button for future orders in a good faith effort to avoid further disputes with the Plaintiff. [Id. ¶ 8]. Faced with a dubious claim, Kohl's made the economically reasonable decision to sell the products already shipped or in inventory. [Id.]. That is not evidence that Kohl's intended to trade on Plaintiff's goodwill—it merely shows that Kohl's acted reasonably under the

CALL&
JENSEN

1    circumstances in the face of disputed title. In sum, this factor favors Kohl's—not

2    Plaintiff.

### h)    Likelihood of Expansion of Product Lines

4         Plaintiff argues that this factor weighs in its favor because the product lines

5    already overlap. But again Plaintiff fails to recognize the difference between its

6    products and Kohl's products. Plaintiff designs and sells luxury goods aimed at the very

7    wealthy. Kohl's mission "is to be the nation's leading family-focused, value-oriented,

8    specialty department store," offering "quality, exclusive, national brand merchandise in

9    an environment that is convenient friendly and exciting." [Krings Dec. Exh. 1

10   (Factbook at 4)]. There is no evidence that Plaintiff intends to expand into Kohl's

11   market for "family-focused, value-oriented" shoppers, or that Kohl's is likely to begin

12   selling REDA jeans. This factor weighs against likelihood of confusion.

### i)    Factors Mitigating Potential Confusion

14        Finally, even assuming there is a potential for post-sale confusion, that potential

15   is mitigated by the fact that Apt. 9 jeans are clearly marked with the Apt. 9 brand name.

16   At point of sale, the accused jeans are clearly marked with Apt. 9 hangtags and Apt. 9

17   labels. [Krings Dec. ¶ 6]. They are sold on racks that have Apt. 9 signs. [Id.]. There is

18   no possible way customers at Kohl's could leave the store thinking the jeans were

19   affiliated with any brand other than Apt. 9. Of course, in the context of post-sale

20   confusion the hangtags will have been thrown away and the store signs will not be

21   visible. But each pair of jeans is permanently marked with the Apt. 9 label, lest the

22   buyer or anyone else have any question as to where they came from. [Id.]. In other

23   words, if anyone has any doubt regarding the true source of these jeans, that doubt can

24   be easily dispelled simply by checking the label.

25

26   / / /

27   / / /

28   / / /

1

## V.   CONCLUSION

2      In conclusion, Plaintiff's motion for summary judgment must be denied. Indeed,

3 it is Kohl's—not Plaintiff—who is entitled to summary judgment on Plaintiff's claims.

4

5 Dated:  February 3, 2014              CALL & JENSEN

6                                      A Professional Corporation
                                       Mark L. Eisenhut
                                       Samuel G. Brooks

7

8                                      By:   /s/Samuel G. Brooks

9                                            Samuel G. Brooks

10                                     Attorneys  for  Defendant  Kohl's  Department
                                       Stores, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT KOHL'S DEPARTMENT STORES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT